IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

ALBERT ANTHONY CARAIG,

    Petitioner,               No. CIV 01-2066 GEB PAN P

    vs.

JAMES YATES, Warden,

    Respondent.          FINDINGS AND RECOMMENDATIONS

_____/

        Petitioner is a state prisoner seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent answered.[1] Petitioner has replied.

        Petitioner challenges his 1998 conviction of two counts of selling cocaine and his sentence of 17 years and 8 months in prison. See Cal. Health & Safety Code § 11352; Cal. Pen. Code § 667(d). The jury found that defendant previously had been convicted of assault with a deadly weapon and previously had been convicted of possession with intent to sell. Cal. Pen. Code § 245(a); Cal Health & Safety Code § 11351.5.

        Petitioner claims he is entitled to relief upon the grounds that (1) the trial court denied petitioner's motion for substitute counsel and counsel's request to withdraw; (2) the trial

---

[1] James Yates is substituted as respondent. See Rule 2(a), Rules Governing § 2254 Proceedings; Fed. R. Civ. P. 25(d).

court required petitioner to wear a stun belt during trial; (3) the evidence is insufficient to sustain the jury's finding he used weapons; (4) the evidence is insufficient to sustain his conviction of selling a controlled substance May 28, 1997, in violation of Cal. Health & Safety Code § 11352; (5) the evidence is insufficient for a rational jury to find he was the seller.

## FACTS[2]

On May 28, 1997, while working undercover purchasing controlled substances, Officers Leora Moses and Sean Fenner met with a woman, later identified as Dolores Miles, who offered to help them make a buy. Miles directed them to a homemade tent on a vacant lot, where she talked to a person outside the tent. That person then talked with someone inside, whereupon defendant emerged from the tent. Miles told defendant that Moses and Fenner wanted a "ten." While defendant chipped chunks of rock off of a larger rock, they bickered with him over the amount of drugs they would receive for $10. When an agreement was reached, they gave defendant $10 and he gave them a few pieces of cocaine base. They then gave Miles some of the cocaine for her efforts in assisting them with the purchase.

Moses and Fenner returned to their vehicle and immediately broadcasted a description of defendant. Another officer received the description, went to the area of the buy, found defendant, and photographed him. Moses identified the photograph of defendant as being that of the person from whom she purchased the cocaine.

On June 11, 1997, Officer Jose Ulloa was working undercover making buys of controlled substances. His vehicle was equipped with video and audiotape equipment. Ulloa contacted several persons, telling them he wanted "diez," which is Spanish for ten. When defendant approached and asked how much he wanted, Ulloa repeated, "diez." Defendant gave Ulloa a rock of cocaine base in return for $10. The transaction was captured on audio and videotape.

Ulloa drove away and immediately broadcast a description of defendant and his clothing. Another officer went to the location of the buy, where he photographed defendant, who matched the description. Ulloa identified the photograph as being that of the person from whom he bought the cocaine.

\* \* \*

At a readiness conference on November 10, 1997, defendant had to be removed physically from the courtroom, and criminal proceedings were suspended while a section 1368 evaluation was conducted. Defendant eventually was found competent to stand trial, and criminal proceedings were reinstated on February 10, 1998.

---

[2] The facts are taken from the opinion of the California Court of Appeal for the Third Appellate District in People v. Caraig, Case No. C030784, October 12, 2000, a copy of which is Exhibit 4, lodged with respondent's February 17, 2006, answer.

Meanwhile, on December 1, 1997, defendant filed a *Marsden* motion (*People v. Marsden* (1970) 2 Cal.3d 118 (hereafter *Marsden*) seeking new court-appointed counsel.  A few days later, defendant filed several pro per motions, including:  a discovery motion in connection with a motion to dismiss; a motion for expungement of his criminal record for July 1975 to December 1981; a motion to strike the allegation that he had a prior serious felony conviction; a *Pitchess* motion (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531); a motion to represent himself (*Faretta v. California* (1975) 422 U.S. 806 [45 L.Ed.2d 562] (hereafter *Faretta*); and another *Marsden* motion.

On January 9, 1998, defendant filed more pro per motions, including:  a motion to exclude the prosecutor from the *Marsden* hearing; a motion for a post-indictment preliminary hearing; a motion to disclose informants; a "letter of request," suggesting a plea resulting in drug diversion; a further discovery motion; and a motion to suppress evidence (§ 1538.5).

On February 4, 1998, defendant filed a petition for writ of habeas corpus, a motion for an order to show cause and temporary restraining order, and a motion for a temporary restraining order and preliminary injunction concerning the conditions of his confinement.

On February 17, 1998, defendant's *Marsden* and *Faretta* motions came on for hearing, and his *Faretta* motion was granted, allowing him to proceed in pro per with his appointed counsel as stand by counsel.

On March 11, 1998, defendant's petition for writ of habeas corpus was denied.  A few weeks later, he filed another petition for writ of habeas corpus, alleging that insufficient evidence had been presented to the grand jury to support the indictment.  Approximately one week thereafter, he filed another petition for writ of habeas corpus based upon the conditions of his confinement.  These petitions were denied.

On April 20, 1998, although defendant was proceeding in pro per, he filed another *Marsden* motion.  He also filed:  a motion to be housed in San Joaquin County jail in preparation for trial; a motion to view the crime scene; motions in limine to exclude his prior convictions, witnesses, and evidence of police witnesses' prior statements and testimony; and a motion to set aside the indictment *(§ 995)*.

On May 18, 1998, the day before the scheduled commencement of his trial, defendant filed a motion for the appointment of new counsel on the ground that defendant could not properly cross examine witnesses.

On May 19, 1998, the day of trial, the court addressed all of defendant's outstanding motions.  It denied the majority of them, including the request for appointed counsel.  Defendant remained mute through the remainder of the pretrial proceedings.  The court told defendant he had every right to remain mute, but invited him to participate in the trial since he was representing himself.

Prior to jury voir dire, the trial court considered whether defendant should remain shackled during trial.  The court reviewed documentation from the jail that

indicated defendant had punched an inmate and that this was the third such assault by defendant. The documentation showed that defendant had assaulted and seriously injured another inmate and that, on other occasions, defendant had been so combative that pepper spray was needed to subdue him. The court determined that defendant presented a substantial likelihood of injuring someone if his shackles were removed. Defendant was given a choice between wearing a REACT belt hidden under his clothing or full shackles, with one hand free to take notes. Defendant chose full shackles.

On May 20, 1998, the court reopened defendant's motion for appointed counsel, granted the motion, and appointed attorney John Panerio to represent defendant. The matter was continued for the setting of a new trial date.

On August 10, 1998, the next date set for jury trial, defendant made another *Marsden* motion. According to defendant, he disagreed with Attorney Panerio regarding tactical decisions, and did not appreciate Panerio's suggestion that defendant plead guilty in exchange for a shorter prison term even though defendant wanted to be sent to a drug diversion program. Defendant also asserted that a conflict of interest existed because he had filed a small claims action against Panerio based upon perceived incompetence.

Panerio, who had practiced criminal law for almost 20 years, explained his tactical choices and the difficulty in defending a case where defendant was identified by undercover police officers as having sold drugs to them and was videotaped selling drugs to one of the undercover officers. Because it appeared to him that defendant did not have a defense, Panerio had suggested defendant plead guilty in exchange for a prison sentence of seven years. Panerio did not believe the small claims action would affect his ability to represent defendant.

The trial court denied the *Marsden* motion. Immediately thereafter, defendant attempted to assault Panerio, threatened him, and refused to cooperate in his defense. This led Panerio to move twice to withdraw as counsel for his own safety. Finding that defendant was intentionally trying to delay the proceedings and to force the appointment of a new defense attorney, the court ruled it would not allow defendant to manipulate the action in this fashion and, thus, denied Panerio's motion to withdraw.

The trial court also ordered that a REACT belt be placed on defendant while a hearing was conducted regarding whether a continued use of the belt was necessary during trial. The REACT belt, which may be hidden under a person's clothing, will deliver an eight-second jolt of 50,000 volts of electricity if activated by a remote transmitter controlled by an attending officer. "This shock will immobilize the wearer and may create a '[p]ossibility of self-defecation' and a '[p]ossibility of self-urination[.]'" (People v. Garcia (1997) 56 Cal.App.4th 1349, 1354.)

At the hearing, bailiff Susan Canete testified as follows: Defendant had been involved in approximately 40 altercations, 6 of which had occurred at the courthouse, and had threatened the safety of court officers and other inmates. Defendant's mother had telephoned to warn officers that defendant said he was

4

going to assault them. On one occasion, defendant threw feces at an officer and was placed in a five-point restraint, but he was able to extricate himself.

The trial court ordered that defendant wear a REACT belt during the remainder of the court proceedings, and ordered that an extra bailiff be assigned to watch defendant. The court also ordered that defendant sit at the edge of the defense table and communicate with counsel by writing on a legal tablet.

Defendant complained that he was worried someone would shock him because he had filed a lawsuit against the sheriff's office. Accordingly, he requested that he wear handcuffs for his own protection so he would appear to be less of a threat. The court granted defendant's request, and advised him it would remove the cuffs at any time defendant wanted.

Panerio expressed concern that defendant would interrupt and object to everything Panerio said because defendant did not want to be represented by Panerio. The court advised defendant not to cause problems and act out in front of the jury, and warned that, if he did so, the court "may have to have [defendant] gagged."

## ANALYSIS

I. Standards for a Writ of Habeas Corpus

Federal habeas corpus relief is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

Under section 2254(d)(1), a state court decision is "contrary to" clearly established United States Supreme Court precedents if it applies a rule that contradicts the governing law set forth in Supreme Court cases, or if it confronts a set of facts that are materially indistinguishable from a decision of the Supreme Court and nevertheless arrives at different result. Early v. Packer, 537 U.S. 3, 7 (2002) (citing Williams v. Taylor, 529 U.S. 362, 405-406 (2000)).

/////

1    Under the "unreasonable application" clause of section 2254(d)(1), a federal
2 habeas court may grant the writ if the state court identifies the correct governing legal principle
3 from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the
4 prisoner's case.  Williams, 529 U.S. at 413.  A federal habeas court "may not issue the writ
5 simply because that court concludes in its independent judgment that the relevant state-court
6 decision applied clearly established federal law erroneously or incorrectly.  Rather, that
7 application must also be unreasonable."  Id. at 412; see also Lockyer v. Andrade, 538 U.S. 63,
8 123 S.Ct. 1166, 1175 (2003) (it is "not enough that a federal habeas court, in its independent
9 review of the legal question, is left with a 'firm conviction' that the state court was 'erroneous.'")

10   The court looks to the last reasoned state court decision as the basis for the state
11 court judgment.  Avila v. Galaza, 297 F.3d 911, 918 (9th Cir. 2002).  Where the state court
12 reaches a decision on the merits but provides no reasoning to support its conclusion, a federal
13 habeas court independently reviews the record to determine whether habeas corpus relief is
14 available under section 2254(d).  Delgado v. Lewis, 223 F.3d 976, 9

15 II.  Petitioner's Claims

16   Petitioner asserts the trial court denied petitioner effective assistance of counsel by
17 denying petitioner's motion for substitute counsel and counsel's request to withdraw.

18   The appellate court determined:

> Whether to grant or deny an attorney's motion to withdraw lies within the sound discretion of the trial court. (*People v. Brown* (1988) 203 Cal.App.3d 1335, 1340.) The court must balance defendant's constitutional right to the effective assistance of counsel against the interest of society in the prompt and efficient administration of justice. (*Ibid*.; *Hudson v. Rushen* (9th Cir. 1982) 686 F.2d 826, 832.)  Our review discloses no abuse of discretion.
>
> Generally, a defendant may not complain that his right to counsel was impaired unconstitutionally when defendant caused the impairment by failing to cooperate with, or by attacking, defense counsel. (*People v. Horton, supra*, 11 Cal.4th at p. 1099 [defendant's refusal to cooperate with appointed counsel does not create a situation entitling defendant to the substitution of a particular attorney]; *People v. Hayes* (1991) 229 Cal .App.3d 1226, 1233-1234 [defendant's right to testify and the right to assist counsel in his defense may be waived where defendant's

contumacious behavior leads to his removal from the courtroom]; *Hall v.Washington* (7th Cir. 1997) 106 F.3d 742, 751 [the right to the effective assistance of counsel may be waived where defendant's refusal to cooperate caused counsel's deficient performance]; *King v. Rowland* (9th Cir. 1992) 977 F.2d 1354, 1356-1357 [trial court did not err in failing to declare a mistrial on the basis of a conflict of interest where defendant attacked his attorney as part of a general plan to delay and disrupt the proceedings]; *Hudson v. Rushen*, *supra*, 686 F.2d at pp. 831-832 [defendant's refusal to cooperate with counsel and his obstreperous behavior may be considered in determining whether defendant's constitutional rights have been infringed].)

Here, the trial judge, who was aware of defendant's numerous pretrial maneuverings, found that defendant's conduct, including the attempted assault on counsel, was intentional and intended to create a conflict of interest and delay the proceedings. Thus, the court concluded correctly that defendant could not be permitted to manipulate the judicial system in this fashion as "[a] contrary holding would enable an indigent criminal defendant to challenge each successive appointment of counsel, delaying indefinitely the criminal prosecution." (Cf. *People v. Horton, supra,* 11 Cal.4th at p. 1106.) "Indeed, '[t]he Sixth Amendment does not give an accused the power to manipulate his choice of counsel to delay the orderly progress of his case.' [Citation.]" (*United States ex rel. Kleba v. McGinnis* (7th Cir. 1986 ) 796 F.2d 947, 952.)

The fact that counsel did not wish to represent defendant is insufficient to establish that counsel's performance was deficient. (*United States ex rel. Kleba v. McGinnis, supra,* 796 F.2d at pp.954-955.) To establish the existence of a conflict of interest entitling defendant to relief on appeal, defendant must demonstrate that his counsel actively served an interest other than defendant's interest and that this adversely affected counsel's performance. (*Strickland* v. *Washington, supra*, 466 U.S. at p. 692 [80 L.Ed.2d at p. 696]; *People v. Alvarez* (1996) *14* Cal.4th 155, 239-240.) Defendant has not shown that Panerio's concern for his own safety adversely affected his performance in that he failed to represent defendant as vigorously as he might have otherwise (*People* v.*Alvarez* supra 14*,* Cal.4th at p. 240), or that there was a lapse in counsel's representation contrary to the defendant's interests. *(Stoia v. U.S.* (7th Cir. 1994) 22 F.3d 766, 771.)

To prevail on a claim counsel was ineffective, a petitioner must allege specific acts or omissions that were not the result of reasonable professional judgment showing counsel's performance fell below an objective standard of reasonableness. <u>Strickland v. Washington</u>, 466 U.S. 668, 690 (1984); <u>see</u> <u>also</u> <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994) ("conclusory allegations which are not supported by a statement of specific facts do not warrant habeas relief"). Courts "strongly presume that counsel's conduct was within the wide range of reasonable assistance, and that he exercised acceptable professional judgment in all significant decisions made." <u>Hughes v. Borg</u>, 898 F.2d 695, 702 (9th Cir. 1990) (citing <u>Strickland</u>, 466 U.S.

at 689).

Petitioner also must affirmatively prove prejudice. Strickland, 466 U.S. at 693. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.; see also Williams v. Taylor, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

The Sixth Amendment does not guarantee an a "meaningful relationship" with counsel, Morris v. Slappy, 461 U.S. 1, 13-14 (1983). A trial court's denial of a continuance to allow an accused's preferred attorney to represent him does not violate the Sixth Amendment where counsel actually representing the accused is prepared for trial. See Slappy, 461 U.S. at 11-12. While forcing an accused to go to trial "with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever," Brown v. Craven, 424 F.2d 1166, 1170 (9th Cir. 1970), where the record shows requests for substitute counsel to be "a transparent ploy for delay," there is no error in proceeding to trial, Slappy, 461 U.S. at 13.

Petitioner opted to represent himself because he disagreed with his attorney's advice. Document 13 at 38. When he realized he could benefit from counsel's assistance, he moved for appointment of counsel. Document 13 at 55-56. The trial court denied the motion and so petitioner refused to participate in the proceedings. Document 13 at 57, 59, 62, 75, 82, 85, 100. The court decided to appoint counsel. Document 15 at 607.

The date trial was to begin, petitioner moved for substitute counsel. Document 13

at 131. When the court denied the motion, petitioner had a violent outburst in court. Document 15 at 132. Counsel moved to withdraw upon the ground he feared petitioner and the attorney-client relationship was "scarred" by petitioner's repeatedly threatening to "get him" if counsel represented petitioner. Document 15. at 134. The trial court denied the motion, finding:

> Having looked at this very lengthy file, the Defendant represented himself pro per and then counsel was appointed. There was a 1368 hearing and he was found to be sane, we have what happened. We had a Marsden motion where I ruled against the Defendant. He didn't like it. And I find that his actions in threatening Mr. Panerio were not really so much he was threatening Mr. Panerio specifically but that he wanted to do something to get Mr. Panerio relieved. And I think it is general knowledge, well, it is general knowledge amongst attorneys that if the client strikes the attorney, that can be grounds for having the attorney relieved, and it seems to me that Mr. Caraig has heard that somewhere and feels that that would get an instant Marsden motion in his favor. I don't think that that necessarily means that you are going to be relieved or the attorney would be relieved. I think Mr. Caraig things [sic] that is what it is. I think that he is doing this intentionally to try and get a new attorney or not so much to get a new attorney but to delay the proceedings. So, reluctantly, I am going to order mr. Panerio to continue, and we will proceed either with or without the Defendant. If he is willing to cooperate and not act in a disorderly fashion, then he will be present. At this point, we are going to keep him in the courtroom. I am not going to take him out unless he engages in disruptive behavior in front of the jury.

Document 13 at 135. As it turned out, petitioner refused to communicate with counsel. Document 13 at 139. The court gave petitioner the choice of proceeding with his appointed attorney or without counsel and petitioner chose the former but refused to participate in his defense. Document 13 at 149-40, 155-56.

Petitioner makes no showing the process in the state court was inadequate. Accordingly, the state court's finding is not an unreasonable determination of the facts in light of the evidence. The determination therefore is entitled to a presumption of correctness which petitioner has failed to rebut.

Petitioner does not allege any specific errors or omissions on the part of counsel Petitioner's claim fails.

The court finds the appellate court's determination was not contrary to or an unreasonable application of clearly established federal law.

Petitioner claims that forcing him to wear a stun belt throughout trial violated his right to be present at trial.

The appellate court determined:

> Defendant points to nothing in the record demonstrating that the [stun] belt impaired his mental faculties or impaired his ability to communicate with counsel; and we will not speculate that this might have occurred. (*People v. Garcia, supra*, 56 Cal .App.4th at p. 1357.) Rather, the record discloses that defendant simply refused to cooperate with counsel, thereby intentionally depriving himself of his right to participate in his own defense.

The Sixth Amendment Confrontation Clause guarantees the right of an accused "to be confronted with the witnesses against him," which comprehends a right to be present at trial. Pointer v. Texas, 380 U.S. 400 (1965); Lewis v. United States, 146 U.S. 370 (1892). But the right no longer is absolute if, despite judicial warning, he engages in disruptive behavior. Illinois v. Allen, 397 U.S. 337, 343 (1970). Pursuant to clearly established Supreme Court precedent a trial court may subdue a disruptive defendant by citing him for contempt, removing him from the court until he promises to behave or, as a last resort, ordering the defendant bound and gagged. Illinois v. Allen, 397 U.S. 337, 343-44 (1970); Holbrook v. Flynn, 475 U.S. 560, 568-69 (1986).

Technology has surpassed this precedent and sometimes, as in this case, a defendant is made to wear a "stun belt," which is an electronic device worn around the waist which can, upon the press of a button, remotely deliver an eight-second 50,000-volt shock. Gonzalez v. Pliler, 341 F.3d 897, 899 (9th Cir. 2003); see also Document 13 at 141-42. The immediate physical consequences include incapacitation and severe pain. Gonzalez, 341 F.3d at 899. Other possible consequences include such as loss of bladder and bowel control, irregular heartbeat or seizures. Id. at 899. Accidental activations have been known to occur. Ibid. Accordingly, before a court can order an accused to wear a stun-belt, the court must find it is necessary to further an essential state interest, which generally is courtroom security. Id. at 901 (finding use of stun belt infringes on Sixth Amendment rights no less than does shackling and so

1  applying the same standard of judicial scrutiny).  To order a defendant to wear a stun belt based
2  on behavior occurring outside the courtroom, there must be sufficient evidence of the conduct on
3  the record so the court can make its own determination of the necessity for the restraint.  Id. at
4  902.
5          While the court resolved pretrial motions, petitioner, representing himself, wore a
6  chain around his waist and handcuffs, which were connected to the chain.  Document 13 at 77.
7  The court considered whether petitioner should be shackled in the jury's presence and considered
8  that petitioner (1) several times attacked other inmates; (2) became so combative with sheriff's
9  deputies that he was subdued with pepper spray and referred for psychiatric evaluation; (3) was
10 found by jail psychiatric staff to be confrontational and dangerous; and (3) flooded his cell.
11 Document 13 at 77-80.  Based on this, the court found petitioner posed such a threat to
12 courtroom security that he should be restrained.
13         The court considered full shackles, no restraints but close physical proximity of
14 several security officers, a leg device that causes the wearer to walk with a limp but essentially
15 prevents him from running and a stun-belt.  Document 13 at 79-80.  The court found that neither
16 the leg device nor close physical proximity of security officers were adequate to restrain
17 petitioner and determined that the stun belt was less intrusive than full shackles because it was
18 not visible.  Document 13 at 80-81.  The court gave petitioner the choice of being shackled with
19 one hand uncuffed or wearing the stun belt but petitioner refused to answer.  Document 13 at 81-
20 82.  The court construed petitioner's silence as a refusal of the belt and ordered petitioner
21 shackled with one hand uncuffed.  Document 13 at 82.
22         Later, when the court denied petitioner's motion to dismiss recently appointed
23 counsel, petitioner "made a violent outburst where he shoved a file containing numerous papers
24 off the defense table onto the floor," "took a swing at his attorney," and more than once had
25 threatened his lawyer.  Document 13 at 132, 158.  The court therefore ordered petitioner to wear
26 the stun-belt "at least for now."  Id.  Petitioner refused to wear the belt and refused to watch the

1 instructional video about it.  Document 13 at 132-33.

2    The court took more evidence relating to petitioner's volatility.  A sheriff's deputy reported petitioner threw a clipboard at a deputy and hit the deputy with it, physically resisted transport to court, threatened to assault deputies and threw feces at a deputy.  Document 13 at 135-37.  After this last incident, he was placed in five-point restraints but escaped.  Document 13 at 137.  Counsel so feared petitioner would harm him during the proceedings, the court ordered an extra bailiff be present for the sole purpose of monitoring petitioner and holding the stun belt control and ordered petitioner to sit about five feet away from counsel.  Document 13 at 139, 158.

   Petitioner did not complain during trial that his ability to communicate with counsel or to take notes was impaired.  Counsel was concerned and so the court permitted the bailiff to pass any notes petitioner might make to counsel.  Document 13 at 160- 61.  Ultimately, petitioner did consult with counsel about whether to testify.  Document 13 at 316.

   The trial court was confronted with an accused who refused to communicate with counsel except to threaten him, refused to respond to the court's inquires and became violent when dissatisfied with how events unfolded.  The appellate court's determination was not contrary to or an unreasonable application of clearly established federal law.

   Petitioner asserts that the trial court violated his rights by threatening to gag petitioner.

   The appellate court concluded:

> As for defendant's claim that the court effectively silenced him by threatening to gag him, this is based on a self-serving view of the evidence.  The court merely advised defendant that a gag would be imposed if he disrupted the trial by yelling out or interfering with his attorney's performance of his duties.  In other words, the court did not preclude defendant from participating and speaking in a suitable fashion; it only warned that it would silence him if he failed to conduct himself with the appropriate decorum.  By doing so, the court did not err or abuse its discretion.

   Shortly before the state presented its case, the court inquired if the defense had

any witnesses. Defendant objected and counsel moved to withdraw because not only did petitioner refuse to communicate with him, but also petitioner planned to object to counsel's representation in front of the jury. Document 13 at 163. The following exchange then occurred:

> Court: Now, you are going to have to decide whether you're going to make the most of this and hope for the best. You have a good attorney. If you want, you can try and cause problems and act out in front of the jury. If you do that, the chances are they're going to hold it against you. More likely, you would be found guilty if you do something foolish in front of the jury.
>
> Petitioner: I have the right to a fair trial and I need to object due to my appeal.
>
> Court: You have an attorney who is doing this for you and it's not for you to object.
>
> Petitioner: Any time a lawyer makes a call, I'm able to make a call too regardless of my - -
>
> Court: I am telling you, if you speak up, speak out loud in front of the jury, if you do then I may have to have you gagged.
>
> Petitioner: You can do what you want. All I am asking is for a fair trial.
>
> The Court: What I'm saying, it's not in your best interest for you to act out or speak up inappropriately in front of the jury because you don't want that jury to - -
>
> Petitioner: It's the same thing.
>
> The Court: - - find against you.
>
> Petitioner: It's the same thing with my fair jury trial and all - - as well it should be disqualification of the judge if I feel there's prejudice.
>
> The Court: I am going to do everything I can to see that you have as fair a trial as possible, but I think a lot of this, if not all of the problems, are by your own creation. In other words, I'm not going to let you create a mistrial here.
>
> * * *
>
> The Court: I don't want to, but if I have to, we'll put a gag on you. You can't speak out in front of the jury.
>
> Petitioner: The only time I would speak out would be my rights and basic under the law, that's all I'm asking.

Document 13 at 164-66.

      The court did not order petitioner to remain silent throughout trial; it ordered petitioner not to "speak out in front of the jury." The court also made specific arrangements for

communication between petitioner and counsel, in the event petitioner decided to communicate with his lawyer.

The appellate court's decision was not contrary to or an unreasonable application of clearly established federal law.

Sufficiency of the Evidence

A federal court may grant habeas relief if, viewing the evidence in the light most favorable to the prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt under applicable state law. Jackson v. Virginia, 443 U.S. 307, 324 (1979). "Put another way, the dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'" Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).[3] It is the province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts." Jackson, 443 U.S. at 319. On federal habeas, a court must review the entire record and determine "whether rational jurors could reach the conclusion that these jurors reached." Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991); Adamson v. Ricketts, 758 F.2d 441, 448 n.11 (9th Cir. 1985), vacated on other grounds, 789 F.2d 722 (9th Cir. 1986) (en banc), rev'd, 483 U.S. 1 (1987).

    Petitioner's Use of Weapons in Prior Offenses

Petitioner asserts the evidence was insufficient for the jury to find he used weapons a dangerous or deadly weapon in the course of a prior felony for which he was convicted. The conviction was used to enhance petitioner's sentence. See Cal. Pen. Code §§ 667(d), 1170.12 (b), 1192.7.(c) (23) .

---

[3] The Ninth Circuit Court of Appeals has declined to consider the question of whether the AEDPA requires an additional degree of deference to state courts' resolution of sufficiency of the evidence claims. See Bruce v. Terhune, 376 F.3d 950, 957 (9th Cir. 2004); Chein v. Shumsky, 373 F.3d 978, 983 (9th Cir. 2004). Because petitioner's claim fails under the Jackson standard this court also need not decide whether the enactment of the AEDPA altered that test for purposes of federal habeas proceedings.

1   The appellate court deteremined:

2   Although defendant had pled guilty to violating section 245, subdivision (a), he contends there was no definitive evidence to establish that he personally used a dangerous or deadly weapon when committing that crime, which is necessary to establish the offense was a serious felony. (§§ 667, subd. (d) (1) ; 1192.7, subd. (c)(23).) According to defendant, because the evidence shows he had an accomplice in the commission of the offense, his guilty plea did not preclude the possibility that the accomplice, not defendant, used the weapon. The contention fails.

\* \* \*

Here, the preliminary hearing transcript from defendant's prior offense discloses the victim testified that defendant "tried to stab me" and "seemed to be bent on sticking me with that knife." The victim stated that he did not think the other individual with defendant even entered the victim's shop.

This evidence supports the jury's finding that defendant was convicted of a prior serious felony in which he personally used a deadly weapon.

In California, the trier of fact may consider the entire record of a prior conviction, including the preliminary hearing, to determine the substance of that conviction. People v.Reed, 13 Cal.4th 217, 223, 229 (Cal. 1996) (permitting use of preliminary hearing transcript to establish that defendant who had entered a plea of guilty personally had used a dangerous or deadly weapon).

The state court's decision is not an unreasonable application of clearly established federal law.

<u>Conviction of Sale of a Controlled Substance  Cal. Health & Safety Code § 11352</u>

Petitioner contends the evidence was not sufficient for a jury to find him guilty of selling a controlled substance on May 28, 1997.

The California Supreme Court summarily denied relief.

California law prohibits the sale of various controlled substances, including cocaine. Cal. Health & Safety Code § 11352. To prove a violation, the state must prove the defendant sold cocaine with knowledge of its presence and narcotic character. People v. Murphy, 134 Cal. App. 4th 1504, 1508 (2005). The finder of fact may infer knowledge based on prior

incidents of possession of the same substance. People v. Goodall, 182 Cal.Rptr. 243 (Cal. 1982). The uncorroborated testimony of a single eyewitness is sufficient to sustain a conviction. See People v. Haider, 40 Cal.Rptr.2d 369 (Cal. App. 1995) (evidence that officer had unobstructed, roof-top view through binoculars of defendant pass to another an off-white rock determined to contain cocaine sufficient even though defendant had only $2 in his pocket when arrested); People v. Powell, 10 Cal.Rptr. 116 (Cal. App. 1960) (where officer positively identified defendant as seller of heroin, trial judge not bound to believe defendant's contrary testimony).

The prosecution adduced evidence that on May 28, 1997, two undercover officers approached several people in front of the homeless shelter in Stockton and unsuccessfully attempted to purchase cocaine. Document 13 at 170-72. A woman offered to help them find a seller and she led them to a homemade tent in a vacant lot, where she inquired of a person who then entered the tent. Document 13 at 171-74. Petitioner emerged and the woman told him the officers "wanted a ten." Document 13 at 175. Petitioner accepted the officers' money in exchange for cocaine. Document 13 at 175-76.

The court finds that under California law, a rational juror could have convicted petitioner on this evidence. Petitioner is not entitled to relief on this claim.

<u>Sufficiency of the Evidence as to Identity</u>

Petitioner contends the evidence was insufficient to find he was the seller. He asserts that he did not possess drugs or marked money when he was arrested and there was no video showing him exchanging money for cocaine.

The California Supreme Court summarily denied relief.

As to the May 28, 1997, sale, an undercover officer identified petitioner as the seller about an hour after the transaction and again in court. Document 13 at 174, 177-78, 196.

As to the June 11, 1997, transaction an officer testified that while he was working undercover in Stockton, two people approached him and asked what he wanted and he responded, "diez." Document 13, at 203. Then defendant approached and asked what the officer

1  wanted and the officer said, "diez," at which point petitioner gave the officer a rock in exchange
2  for ten dollars.  Document 13 at 203.  The officer identified petitioner in court.  Document 13 at
3  204.
4        Under California law, a rational juror could have convicted petitioner on this
5  evidence.  Petitioner is not entitled to relief on this claim.
6        For the reasons stated, IT IS HEREBY RECOMMENDED that petitioner's
7  application for a writ of habeas corpus be denied.
8        These findings and recommendations are submitted to the United States District
9  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days
10 after being served with these findings and recommendations, any party may file written
11 objections with the court and serve a copy on all parties.  Such a document should be captioned
12 "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections
13 within the specified time may waive the right to appeal the District Court's order.  Martinez v.
14 Ylst, 951 F.2d 1153 (9th Cir. 1991).
15 DATED: May 16, 2006.

                                              UNITED STATES MAGISTRATE JUDGE

\004
\ cara2066.157